FILED

IN CLERK'S OFFICE
U S DISTRICT COURT E.D.N.Y.

★ SEP 2 4 2012 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

ADAM STARKE, on his behalf individually and on
behalf of all other persons similarly situated,

                Plaintiff,

     -against-

UNITED PARCEL SERVICE, INC., also known as United
Parcel Service Co., also known as United Parcel General
Services Co.,

                Defendant.

-------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**10-CV-1225 (NGG) (VMS)**

NICHOLAS G. GARAUFIS, United States District Judge.

     United Parcel Service, Inc. ("UPS"), a well-known package delivery carrier, moves to

dismiss Adam Starke's second amended complaint ("Complaint") pursuant to Rule 12(b)(6) of

the Federal Rules of Civil Procedure. At issue in this case is the meaning of a provision in

UPS's standard shipping contract. Starke paid UPS to deliver a letter by the next morning, but,

because of the foreseeable effects of an earlier snow storm, the delivery was delayed. Starke

claims that a guarantee in the contract entitled him to a full refund. UPS maintains that Starke

had no legal right to any refund. UPS is correct. Because the contract expressly excludes from

the guarantee packages "delayed due to causes beyond UPS's control," UPS was not

contractually obligated to refund Starke's money. Accordingly, Starke does not state a valid

claim for breach of contract, and UPS's motion is GRANTED. The Complaint is DISMISSED.

     For the purposes of deciding this motion, the court accepts all of Starke's well-pled

factual allegations as true. See Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). But, if these facts

1

do not amount to a "claim upon which relief can be granted," the court must nevertheless dismiss the Complaint. See Fed R. Civ. P. 12(b)(6).

On February 4, 2010, a severe winter storm struck the Northeast United States. (See Compl. ¶ 21-22.) Less than a week later, there was a second large snow storm. (See id. ¶ 22-23.)

On February 16, in the wake of these storms, Adam Starke took a letter to a store in Brooklyn, New York called "Talk About Shipping." (See id. ¶ 15.)[1] Because the letter contained time-sensitive information (see id. ¶ 14), Starke decided to send the letter by UPS's, "Next Day Air, Early A.M." service (see id ¶ 16). The service was relatively expensive (it cost twenty-seven dollars), but was supposed to ensure that the letter would arrive by 10:30 the next morning. (Id.) Starke tendered his letter to Talk About Shipping, which, "through instantaneous electronic communication with UPS," supplied Starke with a UPS tracking number for the letter. (See id. ¶ 15.)

Starke used the tracking number the following day to confirm that the letter had arrived in Albany as promised and was dismayed to learn that the letter was in fact still in Brooklyn, delayed because of the effects of the previous week's snow storms. (See id. ¶ 17.) He made several more inquires, and each time was informed by UPS employees that delivery was slowed because of weather conditions. (See id. ¶¶ 18-19.) When Starke asked whether he would be

---

[1]    The Complaint does not identify Talk About Shipping by name, but it does refer to "a UPS Authorized Agent at 4403 15th Avenue, Brooklyn, New York 11219." (Compl. ¶ 15.) Relying on publically available information, including records of the New York Department of State, UPS has requested that the court take judicial notice of the fact that the business located at this address is an independently owned "UPS Authorized Shipping Outlet" named Talk About Shipping. (See Mem of Law in Supp. of Mot. to Dismiss (Docket Entry # 57) at 4 n.3.) Starke does not object. Accordingly, the court takes judicial notice that the "UPS Authorized Agent" that is referenced in the Complaint is Talk About Shipping. Cf. Louis Vuitton Malletier S.A. v. LY USA, Inc., 676 F.3d 83, 88 n.2 (2d Cir. 2012) ("This Court may take judicial notice of any fact that 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'" (quoting Fed. R. Evid. 201(b)(2))).

eligible for a refund, UPS employees told him that he was not eligible because the delay in

delivery was due to forces beyond UPS's control. (Id. ¶ 19.)

Finally, at 9:20 A.M., February 18, 2010, UPS delivered the letter in Albany. (See id.

¶ 20.) It was almost twenty-three hours late.

UPS knew, or should have known, that it would not be able to deliver Starke's letter on

time. (See id. ¶ 27.) The back-to-back snow storms wreaked havoc on the Northeast's roads and

airports, and so, by the time Starke sent his letter, UPS faced a severe backlog at its Brooklyn

Foster Avenue facility. (See id. ¶¶ 17, 27.) In spite of this at least contructive knowledge, UPS

continued to sell the Next Day Air, Early A.M. service. (See id. ¶ 27.)

Starke argues that timely delivery of his letter was guaranteed or his money back.

Although he is not specific about the precise source of this alleged guarantee, Starke contends

that:

> UPS guarantees on-schedule delivery of packages shipped via the following
> services, where available, to all 50 states and Puerto Rico:
>     — UPS Air Services
> In the event UPS fails to attempt delivery within the time published on the UPS
> website, or as provided when 1-800-PICK-UPS® is called, UPS, at its option, will
> either credit or refund the transportation charges for each such package to the
> payer only, upon request, provided the conditions set forth in the UPS Service
> Guarantee are met. Transportation charges do not include other fees or charges
> that may be assessed by UPS including, but not limited to, fuel surcharges.

(Id. ¶ 8.)[2] Starke asserts that UPS's failure to deliver the letter on time and its subsequent refusal

---

[2]     The Complaint does not include a citation for this language.  Starke instead purports instead to rely on "any UPS documents governing Next Day Air®." (Compl. ¶ 8.)  The court notes, however, that the language is identical to that making up part of the "UPS Service Guarantee" contained in the UPS Tariff/Terms and Conditions of Service for Package Shipments in the United States ("Tariff").  (See Ex. A. to Decl. of Sonja Jackson (Docket Entry # 59-1) § 47.)  As discussed below, the court concludes that the Tariff is the operative contract in this case, and has reviewed it accordingly.

3

to provide him with a refund constitute a breach of its "Next Day Air® contract." (Id. ¶ 40; see also id. ¶¶ 28-29.)

Before considering the merits of the UPS's motion, the court must first determine the contours and origins of the contract at issue in this case.

The Complaint is extraordinarily vague about the source of UPS's alleged contractual obligations. When discussing the guarantee that he seeks to enforce, Starke refers variously to information found on UPS's website (see id. ¶¶ 8, 10), representations made in UPS's marketing materials (see id. ¶¶ 7-8), and terms found in the UPS Tariff/Terms and Conditions of Service for Package Service in the United States ("Tariff") (see id. ¶¶ 11, 29, 39). In one place, he appears to allege that UPS's duties stem from a composite of all three sources. (See id. ¶ 8.)

Under every body of law with which the court is familiar, the existence of an enforceable contract is a necessary element of a breach of contract claim. Starke has alleged that UPS's carriage of his letter was covered by a contract, but the Complaint does not identify that contact or discuss its formation. The court is thus left with an essentially conclusory allegation and serious questions about whether Starke has met the minimum federal pleading standards. Cf. Fed. R. Civ. P. 8(a)(2) (complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief"); Iqbal, 556 U.S. at 678 (legal conclusions need not be accepted as true by a court evaluating this "showing").

In spite of these questions, the court assumes without deciding that the Complaint is properly plead because, and will construe it as alleging solely a breach of the Tariff.

Such a construction is reasonable because: (1) the Complaint references the Tariff in multiple places; (2) it is clear that the Tariff is in fact the operative contract; and (3) UPS has not

4

challenged the sufficiency of Starke's pleading, assuming throughout its briefs that Starke has

alleged solely a breach of the Tariff. The court infers from Complaint's frequent references to

the Tariff (see Compl. ¶¶ 11, 29, 39.), along with its use of the Tariff's language to describe the

allegedly breached guarantee, see supra note 2, that Starke intended to allege a breach of the

Tariff. These references and quotations also indicate that he relied on the Tariff to draft the

Complaint. "Where a plaintiff has relied on the terms and effect of a document in drafting the

complaint, and that document is thus integral to the complaint, [a court] may consider its

contents even if it is not formally incorporated by reference." Broder v. Cablevision Sys. Corp.,

418 F.3d 187, 196 (2d Cir. 2005) (internal quotation marks omitted). The court has accordingly

reviewed the Tariff, which was attached as an exhibit to UPS's motion papers (see Ex. A. to

Decl. of Sonja Jackson (Docket Entry # 59-1)), and concludes that it was the operative contract.[3]

That the Tariff was, in fact, the operative contract of carriage strengthens the court's conviction

that Starke intended to allege a breach of the Tariff, and probably explains why UPS has

interpreted the Complaint as solely implicating that document. UPS does not challenge the

---

[3]     In relevant part, the Tariff states:

The following contains the general terms and conditions of contract under which United
Parcel Service ® ("UPS") is engaged in the transportation of packages itself and jointly
through interchange with its affiliates via the services described below [including Next
Day Air, Early A.M.].

**************************************************

In tendering a shipment for service, the shipper agrees that the version of the Terms and
the effective Service Guide in effect at the time of shipping will apply to the shipment
and its transportation.

(Tariff § 1.) It thus appears that the rights and obligations of UPS and its shippers regarding the delivery
of packages, such as the letter, are determined by the provisions found directly in the Tariff and those
incorporated by reference into the Tariff from the "effective Service Guide."

sufficiency of the Starke's pleading, and has focused exclusively on the Tariff throughout its

briefing.[4]  (See Mem. of Law in Supp. of Mot. to Dismiss (Docket Entry # 57); Reply in Supp. of

Mot. to Dismiss (Docket Entry # 61)).

      To the extent that Starke asserts a breach of some contract other than the Tariff, this

pleading is insufficient because there are not enough non-conclusory allegations in the Complaint

to plausibly suggest that such an additional contract exists.  Cf. Bell Atl. Corp. v. Twombly, 550

U.S. 544, 569-70 (2007) (plaintiff did not make enough factual allegations to suggest the

existence an illicit agreement was "plausible" rather than merely "conceivable").

      Now that the court has construed the Complaint as alleging a breach of the Tariff, the

second preliminary question that it must resolve is whether state or federal law controls the

construction of this contract.  The parties have not addressed this issue in their briefs.

      It is well established that federal common law controls actions against interstate domestic

air carriers for lost or damaged goods.  See Nippon Fire & Marine Ins. v. Skyway Freight Sys.,

235 F.3d 53, 59 (2d. Cir. 2000).  These claims nearly always require reference to the

liability-limiting provisions of the operative shipping contract, or "airbill", and courts will

similarly rely on federal law to determine the enforceability of these terms.  See, e.g., Treiber

& Straub, Inc. v. UPS, 474 F.3d 379, 384 (7th Cir. 2007); Nippon, 235 F.3d at 59; Read-Rite

Corp. v. Burlington Air Express, Ltd., 186 F.3d 1190, 1198 (9th Cir. 1999); First Pa. Bank, N.A.

v. Eastern Airlines, Inc., 731 F.2d 1113, 1115-16 (3d Cir. 1984).  Courts have also used federal

---

    [4]    For his part, Starke acknowledges in his brief that the Tariff is at least "part" of the
relevant shipping contract (see Mem. of Law in Opp'n to Mot. to Dismiss ("Starke Mem. of Law")
(Docket Entry # 60) at 2 n.2.), and address all of his arguments to that document (see, e.g., id. at 2-4
(quoting the Tariff extensively)).  As in the Complaint, however, Starke does not specifically identify the
other documents or declarations that he believes form the remainder of the contract.

law to interpret airbill provisions that limit liability for damages arising from a carrier's delayed delivery of documents.  See, e.g., Uniden Corp. v. Fed. Express Corp., 642 F. Supp. 263, 265 (M.D. Pa 1986); Apartment Specialists, Inc. v. Purolator Courier Corp., 628 F. Supp. 55, 57 (D.D.C. 1986); Ragsdale v. Airborne Freight Corp., 325 S.E.2d 428, 430 (Ga. Ct. App. 1984).

State law is displaced in these cases to protect a strong federal interest in the efficient transportation of goods and people from state-to-state.  The importance of uniform national regulation of interstate transport has been long recognized by the judiciary, see, e.g., Myrick v. Mich. Cent. R.R. Co, 107 U.S. 102, 109-10 (1883), and it animates a number of federal statutes, perhaps most notably the Carmack Amendment to the Interstate Commerce Act, now codified at 49 U.S.C. § 14706.  Between federal statutory and common law, little room remains for the application of state law to disputes involving interstate common carriers.  See 1 Saul Sorkin, Goods in Transit § 1.23[4] at 1-242-43 (1976 & Supp. 2012) ("Congress, by enacting the Harter Act, the Fire Statute, the Limited Liability Statute, the Carmack Amendment to the Interstate Commerce Act, the Federal Bills of Lading Act, the Interstate Commerce Act, Carriage of Goods by Sea Act, Federal Aviation Program, and by adopting the Warsaw Convention; and by creating various regulatory agencies that have enacted detailed regulations concerning various aspects of interstate and foreign carriage, has preempted the entire field and left no room for state regulation whether by a state legislature or by a state court.").

But not all state law has been preempted.

In American Airlines, Inc. v. Wolens, a divided Supreme Court ruled that state law can be applied to enforce a air carrier's "own, self-imposed undertakings."  513 U.S. 219, 228 (1995). According to the majority of the Court, these "privately ordered obligations"—such as an

7

airline's promise to award frequent flyer miles under certain conditions—can be distinguished from "state-imposed obligations"—such as a state's prohibition on deceptive marketing of a frequent flyer program. See id. at 228-29. The rationale is the that while "state-imposed obligations" effectuate public policies that could disrupt the uniformity Congress intended when it largely occupied the field of interstate transport, "privately ordered obligations" merely represent the intent of the parties to a contract.[5] See id. at 232-33. The majority noted that "because contract law is not at its core diverse, nonuniform, and confusing, we see no large risk of nonuniform adjudication inherent in state-court enforcement of the terms of a uniform agreement prepared by an airline and entered into with its passengers nationwide." Id. at 233 n.8 (citation and quotation marks omitted). It warned, however, that a court's application of state contract law must be limited "to the parties' bargain, with no enlargement or enhancement based on state laws or policies external to the agreement." Id. at 233.

The distinction between state law that creates legal duties between parties and state law that merely effectuates self-imposed duties helps to explain why the cases cited above concerning lost, damaged, or delayed goods—for example, Treiber, Nippon, First Pennsylvania Bank and Apartment Specialists—were decided pursuant to federal law. In these cases, the plaintiffs' claims generally rested on a theory of negligence, breach of bailment, or the breach of some other type of common law duty; and the issues surrounding the airbills' limited liability provisions did

---

[5]    In two separate opinions, Justices Stevens and O'Connor disputed the notion that there is any difference between state enforcement of parties' intent and the imposition of a state's public policy. See, e.g., Wolens, 513 U.S. at 236 (Stevens, J., concurring in part dissenting in part); id. at 247 (O'Connor, J., concurring in part dissenting in part). According to Justice O'Connor, "when a State decides to force parties to comply with a contract, it does so only because it is satisfied that state policy, as expressed in its contract law, will be advanced by that decision." Id. at 248 (O'Connor J., concurring in part and dissenting in part).

8

not concern the provisions' meaning, but whether they should be enforced at all. It also explains why the Ninth Circuit has held that although federal law speaks to the enforceability of an airbill's limited liability provision (an issue of regulatory policy), state law applies to the "precise content" of that clause (an issue of intent). See Read-Rite Corp, 186 F.3d at 1198.

Here, Starke simply seeks the benefit of his bargain. Starke's theory of liability is based purely on breach of contract, not negligence or the breach of any other common law duty; and there is no question that terms of the Tariff apply to UPS's carriage of the letter. The only dispute concerns the meaning of those terms. Limited application of state law to construe the meaning of the Tariff, therefore, does not conflict with the federal interest in the uniform regulation of interstate carriers.

Having determined that state law governs Starke's claim, the court must be sure that it has subject matter jurisdiction. Needless to say, the amount in controversy related to this claim—twenty-seven dollars—falls short of the statutory minimum required in a typical diversity action. See 28 U.S.C. § 1332(a). Starke, however, brings this action not only to remedy his own claim, but also on behalf of a putative class of similarly situated individuals and businesses. (See Compl. ¶ 1.) This class is alleged to consist of every individual or company that purchased Next Day Air, Early A.M. service from UPS between February 8, 2010, and February 18, 2010, for the shipment of packages either to or from the states of New York, Massachusetts, Connecticut, Rhode Island, New Jersey, Pennsylvania, and Maryland, as well as Washington D.C. (See id. ¶¶ 1, 30.) Starke alleges that, when these claims are considered, the amount in controversy rises to more than $5,000,000, and so subject matter jurisdiction will lie under the Class Action Fairness Act of 2004, 28 U.S.C. § 1332(d)(2). (See id. ¶ 2.) Starke's allegation that the putative

9

class has suffered over $5,000,000 in damages is presumed to be a good faith representation of

the actual amount in controversy, see Scherer v. Equitable Life Assurance Soc'y of the U.S., 347

F.3d 394, 397 (2d Cir. 2003), and UPS does not challenge it. Accordingly, the court is satisfied

that it has subject matter jurisdiction over this case pursuant to the Class Action Fairness Act.

     Finally, before turning to the merits of the motion to dismiss, the court must determine

what state's law applies to the contract. Neither party has briefed this issue, although UPS

appears to assume that New York law controls and Starke cites predominately a mixture of New

York and federal common law.

     The district court sitting in diversity applies its forum state's choice of law rules, see

generally Klaxon v. Stentor Elec. Mfg. Co., 313 U.S. 487 (1941), which in this case are the rules

of New York.

> Under the law of New York . . ., the first step in a choice of law analysis is to
> determine whether an actual conflict exists between the laws of the jurisdictions
> involved. If there is such a conflict, New York law looks to the "center of
> gravity" of a contract to determine choice of law. Under the "center of gravity"
> approach, a court may consider a number of significant contacts, including the
> place of contracting, the place of performance, the physical location of property of
> the subject matter of the contract, and the domiciles or places of business of the
> contracting parties. The place of contracting and the place of performance are
> given the greatest weight.

Forest Park Pictures v. Universal TV Network, Inc., 683 F.3d 424, 433 (2d Cir. 2012) (citations

omitted).

     Here there is no need to consider whether there is a conflict between New York's contract

law and that of any other jurisdiction arguably involved in the transaction because the center of

gravity of the contract was clearly in New York. The contract was formed either when Starke

tendered his letter to Talk About Shipping or when Talk About Shipping forwarded the letter to

UPS. In either case formation occurred in Brooklyn. Further, the performance of the contract was to occur entirely in New York. UPS was to carry the letter from Brooklyn to Albany, and Starke was to remit payment at Talk About Shipping in Brooklyn. The Tariff must be interpreted under New York law.

The court now addresses the merits.

UPS raises two arguments in support of its motion to dismiss. First, UPS argues that Starke was not a party to the Tariff, and accordingly cannot sue to enforce its provisions. This theory is based on the fact that Starke tendered the letter and made payment to Talk About Shipping rather than to UPS. Second, UPS argues that—regardless of the identity of its counterparty—it did not breach the Tariff.

Because the Tariff is clear that the UPS Service Guarantee does not apply to "[p]ackages that are delayed due to causes beyond UPS's control" (Tariff § 47.2), Starke has not alleged a breach of contract. Accordingly, the court need not determine whether Starke was even a party to the Tariff.

In New York, as elsewhere, contracts are interpreted to effectuate the parties' intent. See Chimart Assocs. v. Paul, 489 N.E.2d 231, 233 (N.Y. 1986). "The best evidence of what parties to a written agreement intend is what they say in their writing." Greenfield v. Philles Records, 780 N.E.2d 166, 170 (N.Y. 2002) (internal quotation marks omitted). And so "a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." Id. Whether an agreement is unambiguous is an issue of the law for the court to decide. Id. "A contact is unambiguous if the language it uses has a definite and precise meaning, unattended by danger of misconception in the purport of the agreement itself,

11

and concerning which there is no reasonable basis for a difference of opinion." Id. (internal

quotation marks and alterations omitted).

The language of the Tariff is unambiguous. While it is true that "UPS guarantees

on-schedule delivery of packages shipped via [Next Day Air, Early A.M.] to all 50 states" (Tariff

§ 47), the guarantee is not absolute. Rather, it is limited by certain "Exclusions" set forth in

§ 47.2 of the Tariff. In relevant part, the Tariff provides that:

> The UPS Service Guarantee does not apply to:
>
> \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
>
> <u>Packages that are delayed due to causes beyond UPS's control including, but not limited to,</u> the following: The unavailability or refusal of a person to accept delivery of the shipment; acts of God; acts of public authorities acting with actual or apparent authority; acts or omissions of customs or similar authorities; insufficient information provided by a customer; Hazardous Materials packages improperly offered for transport; the application of security regulations imposed by the government, or otherwise applicable to the shipment; riots, strikes or other labor disputes; civil unrest; <u>disruptions in air or ground transportation networks</u>; and <u>natural disasters</u>.

(Tariff § 47.2 (emphasis added).) This language clearly allows UPS to refuse to provide a refund

for delayed service in cases where the delay was caused by forces outside of its control; for

instance, where delivery is delayed because of a major snow storm that has closed airports and

blocked roads.

Starke's attempt to limit the scope of the Exclusions to those circumstances where the

cause of the delay was not only beyond UPS's control, but also unforeseen, has no basis in either

the language of the Tariff or New York law.[6]

---

[6]     Starke also appears to argue the snow storms would be outside the scope of the Exclusions even if they were unforeseeable. (See Starke Mem. of Law at 6-8.) Such an argument is plainly without merit, as the Exclusions provision of the Tariff expressly address "disruptions in air or

Starke argues that a requirement of unforeseeability must always be read into contractual provisions that excuse performance.  For support he relies primarily on <u>United States v. Brooks-Callaway Co.</u>, 318 U.S. 120 (1943)—a case where the Supreme Court interpreted a clause in "the Standard Form of [United States] Government Construction Contract."

Not only was the <u>Brooks-Callaway</u> Court interpreting specific contractual language that is markedly different from that in the Tariff, but it was not applying New York law to that contract.  Accordingly, <u>Brooks-Callaway</u> is of no moment here.[7]

Where Starke does cite to New York law, it also is of no help to him.  His reliance on <u>Kel Kim Corp v. Central Markets, Inc.</u>, 518 N.E.2d 295 (N.Y. 1987), for example, is misplaced.  In that case, the Court of Appeals discussed foreseeablity only in relation to the common law doctrine of impossibility.  <u>See id.</u> at 294.  UPS does not raise a defense of impossibility here.  It relies instead on the language of the Tariff.

Starke does not provide—nor has the court discovered—any New York authority to support his theory that a court must read an unforeeability requirement into contract provisions like § 47.2.  Moreover, if such a rule existed, it would by necessity flow from the State's public policy rather than the intent of the parties, and so it would be likely preempted.  <u>See</u> <u>Wolens</u>, 513 U.S. at 233.  The court will not insert an unforeseeability requirement into an agreement where none exists.

In the alternative, Starke argues that the Tariff is ambiguous, and that a jury must decide

---

ground transportation networks[] and natural disasters."  (Tariff ¶ 47.2.)

[7]      The same is true with respect to <u>Gulf Oil Corp. v. FERC</u>, 706 F.2d 444 (3d Cir. 1983), which also did not involve New York law.

whether the parties intended to exclude delays like those caused by the snow storms from the

UPS Service Guarantee. Starke claims that "[t]here are at least three (3) reasons why

'disruptions in air . . . transportation networks' is ambiguous." (Starke Mem. of Law at 11.)

First, he seems to argue that the word "disruptions" as used in § 47.2 could mean changes to

transportation networks before or after the formation of the contract, but not both. Second, he

argues that some types of "disruptions"—presumably those occurring prior to formation—might

not be covered by § 47.2 because another provision in the Tariff refers to "disruptions of any

kind." (See Tariff § 49.3 (emphasis added).) And third, he argues that it is unclear whether

"disruptions" includes foreseeable disruptions because the section of the Tariff addressing

consequential damages expressly disclaims liability for foreseeable losses. (See id.)

Leaving aside that the delay caused by the snow storms is likely also covered by § 47.2 as

a "natural disaster," Starke's arguments regarding "disruptions" are unconvincing. The word

"disruptions" imputes nothing about forseeability one way or another. A disruption can be

foreseen. A disruption can be unforeseen. For example, a low-flying air plane will surely

"disrupt" a meditation session regardless of whether the person meditating knows that the plane

is scheduled to pass by at that time of day. Without modifying language, "disruptions" means

both unforeseen interruptions and foreseen interruptions. Here, there is no modifying language.

That another provision of the Tariff addresses the issue of foreseeability with respect to damages

is not relevant to the meaning of § 47.2. In that other section, § 49.3, the Tariff quite clearly

seeks to abrogate the old common law rule of Hadley v. Baxendale, 156 Eng. Rep. 145 (Ct.

Exch. 1854), that a common carrier will be liable for all foreseeable consequential damages

occasioned by delayed delivery. Similarly, the court fails to see how the use of the phrase "of

14

any kind" to modify the word "disruptions" in another unrelated provision of the Tariff has any bearing on the meaning of the "disruptions" when the word is used in § 47.2. "Disruptions" is not a defined term. It must be afforded the meaning most natural given the words around it. In the context of § 47.2, "disruptions in air or ground transportation networks" means what it says: interruptions—foreseeable and unforeseeable—to the normal accessability of air or ground transportation infrastructure.

Moreover, even if the snow storms and their effects were not among the specific examples provided in § 47.2, they would still be "causes beyond UPS's control" for the purposes of that provision. There is no textual basis for limiting this term to unforeseen causes. As with "disruptions", the word "causes" is unmodified and therefore must encompass both foreseen and unforeseen events.

Finally, although not a necessary basis for the court's ruling, the court notes that it is extremely unlikely a large international carrier like UPS would ever agree to a contract containing a guarantee as expansive as that urged by Starke. There would be simply no practical way for UPS to notify all potential shippers of the existence of a foreseeable delay before shippers tendered their packages for Next Day Air Service. This would be especially true where a shipper uses one of the nearly 40,000 so-called "UPS Drop Boxes," see UPS Website, http://www.ups.com/ content/us/en/locations /dropboxes/index.html?WT.svl=PNRO_L1 (last visited Sept. 21, 2012), and thereby avoids any personal interaction with UPS employees. The effect of such guarantee would be that UPS would ship for free every time an arguably foreseeable—yet uncontrollable—event caused a delay in service. It is thus no surprise that UPS has not voluntarily assumed such an obligations.

15

Because the Tariff unambiguously excludes from the UPS Service Guarantee packages delayed by events beyond UPS's control, such as those delayed due to snow storms, Starke could not have been entitled to a refund under the Tariff.  As such, UPS's failure to provide him with a refund was not a breach of contract, and so Starke has failed to state a claim upon which relief can be granted.  The motion is GRANTED and the Complaint is DISMISSED.  The Clerk of Court is respectfully directed to close the case.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
      September 24, 2012

NICHOLAS G. GARAUFIS
United States District Judge

16